UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
JUSTIN PINCKNEY,

                              **Plaintiff,**

      - against -

MARIA TORRES-SPRINGER, as Commissioner of the
New York City Department of Housing and
Development,
THE NEW YORK CITY DEPARTMENT OF
HOUSING PRESERVATION AND DEVELOPMENT,
and THE CITY OF NEW YORK,

                              **Defendants.**
----------------------------------------------------------------------x

**COMPLAINT
AND JURY DEMAND**

Civil Action No. 18-CV-12198

## PRELIMINARY STATEMENT

    1.     Plaintiff Justin Pinckney brings this action to challenge actions by Defendants that, after the recent death of their mother, have placed him and his brother at imminent risk of homelessness.  As set forth below, Defendants terminated Plaintiff's family's Section 8 housing assistance benefits at a time when his mother, who was the head of his family's household, was gravely ill following a stroke.  Although Defendants were aware of her illness, they extended no assistance to Plaintiff's mother in completing their recertification process, and they held her to a strict deadline for appealing their termination of the family's benefits, although she was hospitalized during the period leading up to and including the deadline for filing an appeal.  Because Defendants' actions violated their obligations under federal, state, and local disability discrimination laws, and because he and his brother have been harmed by Defendants' unlawful behavior, Plaintiff now brings this action seeking restoration of his family's Section 8 benefits, damages, fees, and costs.

## JURISDICTION AND VENUE

2.      The Court has original jurisdiction of civil actions arising under the laws of the United States pursuant to 28 U.S.C. § 1331, and has jurisdiction of civil actions to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights pursuant to 28 U.S.C. § 1343.  The Court has supplemental jurisdiction over related state and local claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).  The Southern District of New York is the judicial district in which a substantial part of the events or omissions giving rise to the claims in this case occurred.

## PARTIES

4.      Plaintiff Justin Pinckney is a succeeding tenant at the premises located at 1211 Southern Boulevard, Apartment 315, Bronx, New York 10459, where his family has lived since 2008.  Plaintiff's now-deceased mother, Laurette Pinckney, participated in the Section 8 voucher program beginning in the year 2008, and was terminated from the program by Defendant New York City Department of Housing Preservation and Development in February 2017.

5.      Defendant Maria Torres-Springer (hereinafter, "Torres-Springer") is the Commissioner of Defendant New York City Department of Housing Preservation and Development (hereinafter, "HPD"), and is responsible for HPD's compliance with the laws, rules and regulations governing the Section 8 Housing Choice Voucher Program through which Ms. Pinckney received her Section 8 housing subsidy.  Torres-Springer maintains her principal office at 100 Gold Street, in the City, County, and State of New York.

6.      Defendant New York City Department of Housing Preservation and

Development is an instrumentality of Defendant City of New York, organized under the New York City Charter and the laws of the State of New York.  HPD's stated mission is to preserve the availability, affordability, and quality of housing in New York City.  As part of this mission, HPD acts as one of the "public housing agencies" administering the Section 8 Housing Choice Voucher program (hereinafter "the Section 8 program"), a federally funded rental subsidy program authorized under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f.  The Section 8 program is designed to assist low-income households in maintaining affordable housing.  HPD has promulgated standards and procedures applicable to its administration of Section 8 subsidies and is subject to federal regulations promulgated by the United States Department of Housing and Urban Development (hereinafter, "HUD").  HPD administers the Section 8 rent subsidy which was issued to Ms. Pinckney.  HPD maintains its principal office at 100 Gold Street, in the City, County and State of New York.

7.     Defendant City of New York is a municipal corporation within the State of New York, whose instrumentalities include Defendant New York City Department of Housing Preservation and Development.  Defendant City of New York is generally represented in civil matters by the New York City Law Department, whose principal office is located at 100 Church Street, in the City, County and State of New York.

## STATUTORY AND REGULATORY FRAMEWORK

### Section 8 of the United States Housing Act

8.     Congress enacted the United States Housing Act of 1937 (hereinafter "the Housing Act") to "remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families."  42 U.S.C. § 1437(a)(1)(A).

9.     Section 8 of the Housing Act, as codified at 42 U.S.C. § 1437f(a),

provides that:

> For the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section.

42 U.S.C. § 1437f(a).

10.     Section 8 of the Housing Act authorizes the Secretary of HUD "to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section."  42 U.S.C. § 1437f(b)(1); *see also* 24 C.F.R. § 982.151 (regulations governing contributions contracts).

11.     Pursuant to this authority, HUD has entered into an annual contributions contract with HPD to administer a Section 8 Housing Choice Voucher program in New York City.

12.     In administering its Section 8 Housing Choice Voucher program as a "public housing agency" within the meaning of the Housing Act, HPD is required to comply with HUD regulations and requirements governing Section 8 programs.  24 C.F.R. § 982.52.

13.     Federal regulations specify the grounds upon which a public housing agency may terminate a participating family's Section 8 benefits.  Among other things, the agency may terminate assistance if the family violates program obligations.  24 C.F.R § 982.552(c)(1)(i).   When a public housing agency terminates assistance to a participating family on grounds of family's "action or failure to act," the public housing agency must provide the family with prompt written notice of the reason for termination, and notify the participant family of their opportunity to request an informal hearing, including the deadline to request the hearing.  24 C.F.R. §§ 982.555(a)(2)(iv), 982.555(c)(2).

14.     Termination is not, however, the mandatory result of any such violation. A public housing agency may consider "all relevant circumstances" in determining whether to terminate assistance to a participating family, including "the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure."  24 C.F.R. § 982.552(c)(2)(i).

15.     A "Housing Choice Voucher Program Guidebook" made available on the HUD's public website sets forth methods and requirements for the verification of participant income and the denial or termination of assistance.  Public housing agencies have discretion to terminate or not to terminate assistance, and "the [public housing agency] may determine that the seriousness of the situation does not warrant denial.  For example, a family who was terminated for failure to recertify may be evaluated differently than an applicant family who was terminated from public housing for wanton destruction of public housing property."  HOUSING CHOICE VOUCHER PROGRAM GUIDEBOOK, Chapter 5.7—Denial of Assistance, *available at* https://www.hud.gov/sites/documents/DOC_35615.PDF.

### The Americans with Disabilities Act

16.     Title II of the Americans with Disabilities Act (hereinafter, the "ADA"), 42 U.S.C. § 12101 *et seq.*, states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a).

17.     Under the ADA and its implementing regulations, a "disability" is a "physical or mental impairment that substantially limits one or more of the major life activities

5

of such individual; a record of such an impairment; or [is] regarded as having such an

impairment." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108(a).

18.     The term "physical or mental impairment" means:

(A)     Any physiological disorder or condition, cosmetic disfigurement, or
anatomical loss affecting one or more of the following body systems:
Neurological, musculoskeletal, special sense organs, respiratory (including speech
organs), cardiovascular, reproductive, digestive, genitourinary, hemic and
lymphatic, skin, and endocrine;

(B)     Any mental or psychological disorder such as mental retardation, organic
brain syndrome, emotional or mental illness, and specific learning disabilities.

28 C.F.R. § 35.108(b)(1).

19.     A "public entity" is defined to include, among other things, "any department,

agency, special purpose district or other instrumentality of a State or States or local government."

42 U.S.C. § 12131(1)(B); 28 C.F.R. § 35.104.

20.     A "qualified individual with a disability" is defined as "an individual with a

disability who, with or without reasonable modifications to rules, policies, or practices, the

removal of architectural, communication, or transportation barriers, or the provision of auxiliary

aids and services, meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); 28

C.F.R. § 35.104.

21.     Federal regulations further describe the ADA's general prohibition against

discrimination by any public entity on the basis of disability.  Among other things:

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly
or through contractual, licensing, or other arrangements, on the basis of
disability—

(i)     Deny a qualified individual with a disability the opportunity to participate
in or benefit from the aid, benefit, or service;

(ii)     Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii)    Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

* * *

(vii)   Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

* * *

(b)(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i)     That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

28 C.F.R. § 35.130(b).

22.     A public entity is further required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

23.     In its public guidance, the U.S. Department of Justice has provided examples of such required modifications to public entity policies, practices, or procedures.  One such example makes clear that a public entity may be required to modify its application process to avoid the unlawful denial of benefits to disabled individuals:

7

> A county general relief program provides emergency food, shelter, and cash grants to individuals who can demonstrate their eligibility.  The application process, however, is extremely lengthy and complex.  When many individuals with mental disabilities apply for benefits, they are unable to complete the application process successfully.  As a result, they are effectively denied benefits to which they are otherwise entitled.  In this case, the county has an obligation to make reasonable modifications to its application process to ensure that otherwise eligible individuals are not denied needed benefits.  Modifications to the relief program might include simplifying the application process or providing applicants who have mental disabilities with individualized assistance to complete the process.

THE AMERICANS WITH DISABILITIES ACT—TITLE II TECHNICAL ASSISTANCE MANUAL, Section II-3.6100, *available at* https://www.ada.gov/taman2.html ("Illustration 2").

### **Section 504 of the Rehabilitation Act of 1973**

24.     Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 *et seq.* (hereinafter, the "Rehabilitation Act"), prohibits discrimination against any qualified individual with a disability under any program or activity receiving federal financial assistance:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).  Subject to certain exceptions, the Rehabilitation Act adopts a definition of "individual with a disability" that follows the definition of "disability" set forth in the ADA. 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1).

25.     Federal regulations implementing Section 504 prohibit any recipient of federal funds from utilizing criteria or methods of administration whose purpose or effect would "[d]efeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap."  24 C.F.R.

8

§ 8.4(b)(4).

26.     Federally assisted programs "must afford individuals with handicaps equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as "non-handicapped persons."  24 C.F.R. § 8.4(b)(2).

27.     The definition of "individual with handicaps" for purposes of these implementing regulations substantially follows the definition of "disability" and "qualified individual with disability" as used in the ADA as well as the Rehabilitation Act.  24 C.F.R. § 8.3; 42 U.S.C. § 12102(1).

28.     The remedies, procedures, and rights provided by the Rehabilitation Act are also incorporated into the ADA.  42 U.S.C. § 12133.  Federal regulations implementing title II of the ADA provide that standards under the ADA and implementing regulations are not to be construed as imposing lesser standards than those applied under the Rehabilitation Act and its implementing regulations.  28 C.F.R. § 35.103(a).

### Title VIII of the Civil Rights Act of 1968, as amended
### by the Fair Housing Amendments Act of 1988

29.     Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* (hereinafter, the "FHA"), states that "it shall be unlawful . . . [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter; or . . . (C) any person associated with that buyer or renter."  42 U.S.C. § 3604(f)(1); *see also* 24 C.F.R. § 100.202(a).

30.     Similarly, "it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services

or facilities in connection with such dwelling, because of a handicap of—(A) that person; or . . . (C) any person associated with that person."  42 U.S.C. § 3604(f)(2); *see also* 24 C.F.R. § 100.202(b).

31.    A "handicap" within the meaning of the FHA is defined in a manner substantially identical to a "disability" within the meaning of the ADA and Rehabilitation Act, and means "a physical or mental impairment which substantially limits one or more of such person's major life activities," "a record of having such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 3602(h); *see* 24 C.F.R. § 100.201.  "Major life activities" are defined by FHA implementing regulations to include functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  24 C.F.R. § 100.201(b).

32.    Unlawful "discrimination" within the meaning of the FHA includes, among other things, "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person [with a handicap] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3); *see also* 24 C.F.R. § 100.204(a).

### New York State Human Rights Law

33.    The New York State Human Rights Law, codified as title 15 of the Executive Law, makes it an "unlawful discriminatory practice for any person, being the owner, lessee, . . . manager, . . . agent or employee of any place of public accommodation . . . , because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."  N.Y. Exec. Law § 296(2)(a).

10

34.    Such discriminatory practices include any "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations."  N.Y. Exec. Law § 296(2)(c).

35.    "Place of public accommodation" is defined by the New York State Human Rights Law to include, *inter alia*, "establishments dealing with goods or services of any kind, dispensaries, clinics and hospitals." N.Y. Exec. Law § 292(9).

36.    The New York State Human Rights Law defines "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  N.Y. Exec. Law § 292(21).

37.    Section 300 of the New York State Human Rights Law modifies generally applicable principles of statutory interpretation to require that the provisions therein "shall be construed liberally for the accomplishment of the purposes thereof."  N.Y. Exec. Law § 300.

## New York City Human Rights Law

38.    The New York City Human Rights Law, codified at title 8 of the New York City Administrative Code, makes it "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of a public accommodation because of the actual or perceived . . . disability . . . directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations,

11

advantages, facilities or privileges thereof." N.Y.C. Admin. Code § 8-107(4)(a).

39.     Such discriminatory practices include any refusal "to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15).

40.     A "reasonable accommodation" for purposes of the New York City Human Rights Law means "such accommodation that can be made that does not cause undue hardship in the conduct of the covered entity's business," provided that the covered entity has the burden of proving such undue hardship. N.Y.C. Admin. Code § 8-102.

41.     It is also an unlawful discriminatory practice "for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require an accommodation related to disability as provided in subdivision 15 of [section 8-107 of the New York City Human Rights Law]." N.Y.C. Admin. Code § 8-107(28).

42.     "Place or provider of public accommodation" is defined by the New York City Human Rights Law to include, *inter alia*, "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind." N.Y.C. Admin. Code § 8-102.

43.     The New York City Human Rights Law defines "disability" as "any physical, medical, mental, or psychological impairment." N.Y.C. Admin. Code § 8-102.

44.     The prohibitions of the New York City Human Rights Law against

12

unlawful discriminatory practices apply not only to discrimination against a person based on a

disability, but also to discrimination against a person based on disability of "a person with whom

such person has a known relationship or association."  N.Y.C. Admin. Code § 8-107(20).

45.     Section 8-130 of the New York City Human Rights Law modifies

generally applicable principles of statutory interpretation to require that all anti-discrimination

provisions therein "shall be construed liberally for the accomplishment of the uniquely broad and

remedial purposes thereof," and that "exceptions and exemptions from the provisions of this title

[8] shall be construed narrowly in order to maximize deterrence of discriminatory conduct."

N.Y.C. Admin. Code §§ 8-130(a), (b).

### Article 78 of the New York Civil Practice Law and Rules

46.     Article 78 of the New York Civil Practice Law and Rules (the "CPLR")

codifies certain causes of action enabling plaintiffs to seek relief from the actions of

governmental "bodies or officers."  N.Y. C.P.L.R. §§ 7801, 7803.

47.     A "body or officer" within the meaning of article 78 of the CPLR includes

"every court, tribunal, board, corporation, officer, or other person, or aggregation of persons,

whose action may be affected by a proceeding under this article."  N.Y. C.P.L.R. § 7802(a).

48.     Among other things, the plaintiff in an "Article 78" proceeding may raise

the question of "whether a determination [by a body or officer] was made in violation of lawful

procedure, was affected by an error of law or was arbitrary and capricious or an abuse of

discretion, including abuse of discretion as to the measure or mode of penalty or discipline

imposed."  N.Y. C.P.L.R. § 7803(3).

49.     In an Article 78 proceeding commenced to review the determination of a

body or officer, the judgment of the court "may annul or confirm [such] determination in whole

or in part, or modify it, and may direct or prohibit specified action by the respondent."  N.Y.

C.P.L.R. § 7806.

### The HPD Administrative Plan

50.    Federal regulations governing the Section 8 program require that each

public housing agency adopt a written administrative plan establishing local policies for the

administration of the Section 8 program.  24 C.F.R. § 982.54(a).  The administrative plan must

be in accordance with HUD regulations and requirements.  24 C.F.R. § 982.54(b).

51.    The public housing agency must administer the Section 8 program in

accordance with its administrative plan. 24 C.F.R. § 982.54(c).

52.    HPD has promulgated rules and policies for the implementation of its

Section 8 Housing Choice Voucher program, which are set forth in its Housing Choice Voucher

Program Administrative Plan (hereinafter, the "Administrative Plan").  The most recent publicly

available version of HPD's Administrative Plan is dated April 17, 2018.  This version of the

Administrative Plan is available from HPD's public website at

http://www1.nyc.gov/assets/hpd/downloads/pdf/administrative-plan.pdf.

53.    Each public housing agency's administrative plan must cover the agency's

policies on certain specified subjects, including "[h]ow to determine who remains in the [Section

8] program if a family breaks up."  24 C.F.R. § 982.54(d)(11).

54.    HPD's policy regarding "family break-up" is set forth in Chapter 5.1.4 of

the Administrative Plan.  As a matter of HPD policy, certain surviving family members may

retain the use of the family's Section 8 rent subsidy after the death of the head of household.

Following admission of a family into the Section 8 program, for example, the Administrative

Plan provides that:

14

> In the event that the head of household moves out of the assisted unit or dies, a remaining adult household member (without children) may retain use of the tenant-based voucher if that adult has been part of the household for at least 180 days, is in compliance with all program rules and regulations and meets all other program eligibility and continued occupancy requirements.

HPD Admin. Plan, Ch. 5.1.4.1.

55.     Regarding the termination of a participant family's Section 8 rent subsidy, the Administrative Plan provides that "[a]n applicant or [Section 8] participant who fails to keep an appointment or to supply information required by a deadline without notifying the agency may be sent a notice of denial or termination of assistance for failure to provide required information."  HPD Admin. Plan, Ch. 15.12.

56.     Upon a participant family's failure to submit information for recertification, HPD must send a Pre-Termination Notice notifying the family of the noncompliance and of the opportunity, within 15 days, to request a conference to discuss the family's eligibility or to submit the requisite recertification documentation.  If the participant family fails to respond or responds inadequately, HPD will send notice of its decision to terminate the subsidy.  HPD Admin. Plan, Ch. 13.1.

57.     A participant family may appeal HPD's determination to terminate assistance by requesting an informal hearing in writing within 30 calendar days from the date printed on the notice of termination.  See HPD Admin. Plan, Ch. 16.1.2.

58.     The Administrative Plan allows that a participant family may have an "acceptable" reason for missing an appointment or failing to provide information by a deadline. These "acceptable reasons" include a medical emergency, a family emergency, or "any other reason that HPD deems appropriate," provided that the Administrative Plan further states that

15

such reasons "are only acceptable if HPD is notified in a timely manner." HPD Admin. Plan, Ch. 15.12.

59. The Administrative Plan further states that "HPD shall not deny any family or individual the equal opportunity to apply for or receive assistance under the Housing Choice Voucher program on the basis of . . . disability." HPD Admin. Plan, Ch. 2.1. HPD has acknowledged its obligation to administer its Housing Choice Voucher Program in conformance with the ADA and the Rehabilitation Act. HPD Admin. Plan, Ch. 1.1.

60. The Administrative Plan also states that HPD "will make reasonable accommodations for persons with disabilities to ensure that they may fully access and use the voucher program and related services." HPD Admin. Plan, Ch. 2.3. Such policy is "intended to afford persons with disabilities equal opportunity to obtain the same results and gain the same benefits as those who do not have disabilities, and is applicable to all situations described in this plan [the Administrative Plan]." *Id.*

## FACTS

61. Plaintiff Justin Pinckney is a disabled 24-year-old tenant living with his 20-year-old brother, Duaine McIntosh, in a rent-stabilized apartment located at 1211 Southern Boulevard, Apartment 315, Bronx, New York 10459. Plaintiff and his family have lived at this address since 2008.

62. Before moving into their current home, Plaintiff's family lived for about three years in New York City's homeless shelter system. Plaintiff's family left the shelter system when Plaintiff was 13 years old and his brother was nine years old.

63. Plaintiff's mother, the late Laurette Pinckney, was a participant in the Section 8 Housing Voucher Program administered by HPD beginning in or around April 2008.

16

Her voucher has been utilized at the family's current address since in or around June 2008, when the family moved into that address.

64. Until her death in June 2018, Ms. Pinckney lived with her two sons— Plaintiff and his brother. Plaintiff lived with his family at their current address for the entire duration of his mother's tenancy at that address.

65. For the entire time Ms. Pinckney and her family held a Section 8 voucher, Plaintiff was listed as a member of Ms. Pinckney's household on recertification forms and other required documentation.

66. In or around September 2016, Ms. Pinckney suffered a stroke and, as a result, could no longer work and needed to use a wheelchair. Ms. Pinckney's medical records indicate a history of heart disease, diabetes, chronic obstructive pulmonary disorder and other conditions. Ms. Pinckney's physical and mental condition worsened following her stroke, in part because Ms. Pinckney lost much of her ability to take care of herself. As Ms. Pinckney's home attendant worked limited hours and did not always come to work due to staffing problems at the home care service, Plaintiff—then 22 years old—became her primary caregiver.

67. Ms. Pinckney had always handled matters relating to her Section 8 voucher by herself rather than involving her sons. After suffering a stroke, she remained in charge of managing these matters despite her declining capacity to do so, and she did not have the ability to timely comply with all of the recertification and other requirements for her voucher.

68. Plaintiff suffers from depression and bipolar disorder, but managed to work a series of part-time jobs to support his family after his mother became unable to work. In the two years following his mother's stroke, however, he was frequently overwhelmed by his mother's deterioration, and by the landlord's efforts to evict their family. He was also unfamiliar

with Section 8 requirements, and did not know to assist his mother in interacting with HPD.

69.    On or around November 28, 2016, Ms. Pinckney learned that her landlord, 1211 Southern Boulevard, LLC, had commenced a summary eviction proceeding against her in the Housing Part of the Civil Court of the City of New York, Bronx County (hereinafter, the "Bronx housing court"), for nonpayment of rent.  This eviction proceeding, Index number L&T-42983-16/BX, had been commenced on or around July 22, 2016, and a default judgment had been entered against Ms. Pinckney on November 9, 2016.

70.    Ms. Pinckney appeared in this nonpayment proceeding for the first time on or around December 11, 2016.  At that time, case number L&T-42983-16/BX was adjourned to February 2, 2017 for Ms. Pinckney to be referred to Adult Protective Services, a division of the New York City Human Resources Administration (hereinafter, "APS").

71.    According to the court file for case number L&T-42983-16/BX, a court referral to APS was completed for Ms. Pinckney, noting the adjourned date of February 2, 2017 for the proceeding.  Upon information and belief, such court referrals are typically completed by court personnel.  Ms. Pinckney's APS referral noted that she exhibited "slurred speech / inability to speak" and "physical illness or injury," and that she was "homebound" and "unable to leave home without assistance."

72.    The APS referral also noted that Ms. Pinckney's Section 8 tenant share of the rent was $481, and that "this should be reduced b/c [because] R [respondent Laurette Pinckney] became unable to work after stroke."  The court record for case number L&T-42983-16/BX available to Plaintiff does not, however, indicate that a guardian ad litem was appointed for Ms. Pinckney in that proceeding.

73.    On or around January 17, 2017, HPD issued a "Notice of Section 8 Rent

Subsidy Termination" to Ms. Pinckney (hereinafter, the "Termination Notice").  The

Termination Notice, which was dated January 17, 2017, stated that Ms. Pinckney's Section 8 rent

subsidy would be terminated because she had allegedly failed to provide certain documents,

including her form W-2 for the year 2015; documentation of her employment income in the form

of pay stubs; a declaration of employment for Plaintiff Justin Pinckney; and an unspecified

"release form" and "debt owed form."

74.     The Termination Notice further stated that Ms. Pinckney's HPD Section 8

rent subsidy would be terminated at the end of February 2017 unless HPD received a timely

request from Ms. Pinckney for an informal hearing to contest the termination.  The Termination

Notice required Ms. Pinckney to submit such a request so that it would be received by HPD

within 30 days after the date of the Termination Notice—that is, on or before February 16, 2017.

75.     On February 2, 2017, the adjourned date for her nonpayment proceeding,

Ms. Pinckney was hospitalized after her family found her weak and unresponsive in her home.

Ms. Pinckney was taken to the hospital by her family and defaulted on her appearance in

proceeding L&T-42983-16/BX.

76.     After Plaintiff had brought his mother to the hospital, he filed an Order to

Show Cause at the Bronx housing court, seeking a stay of eviction on behalf of Ms. Pinckney

and requesting that proceeding L&T-42983-16/BX be restored to the court's calendar.

77.     Plaintiff's affidavit in support of this Order to Show Cause reported that

his mother had "got into a sugar-coma so she couldn't make it" to the court.  Plaintiff added, "I

don't know how long she's going to stay in the hospital."

78.     Ms. Pinckney remained in the hospital until on or around Friday, February

17, 2017.  Ms. Pinckney visited HPD's office on or around Tuesday, February 21, 2017, with her

19

home health aide, her niece and her younger son, Duaine McIntosh.

79.     On this visit, Ms. Pinckney informed HPD personnel on duty that she had been unable to comply with HPD's documentation requirements because she had had a stroke, and further informed HPD personnel that she had just been released from the hospital.  Ms. Pinckney asked to submit her required documentation to HPD.  Ms. Pinckney was in a wheelchair during this visit.

80.     HPD personnel accepted the documentation Ms. Pinckney had brought to HPD's office, and instructed Ms. Pinckney to submit a written request for a hearing regarding her Section 8 rent subsidy.  Ms. Pinckney completed and submitted a request form provided by HPD personnel, and left HPD's office.

81.     Shortly following Ms. Pinckney's visit to HPD on or around February 21, 2017, Ms. Pinckney received a letter from HPD informing her that her Section 8 rent subsidy would not be reinstated and that her request for a hearing was untimely.

82.     In or around March 2017, after receiving this letter, Ms. Pinckney again visited HPD's office, this time accompanied by Plaintiff.  Plaintiff and his mother were told by HPD personnel that Ms. Pinckney should retain a lawyer to dispute the termination of Ms. Pinckney's Section 8 rent subsidy.  HPD personnel did not provide any referral to free legal services programs or any other information about steps Ms. Pinckney could take to restore her Section 8 benefits.

83.     Ms. Pinckney subsequently contacted HPD several times by phone to ask how she could restore her Section 8 rent subsidy; and made several visits to HPD's office, accompanied by family members or her home health aide, for the same purpose.  Despite these efforts, she was unable to make meaningful progress toward the reinstatement of her benefit.

20

84.     HPD never at any time engaged in any dialogue with Ms. Pinckney, any member of her family, or any home health aide assisting her, regarding any accommodation of her physical or mental condition; nor did HPD take any action to accommodate Ms. Pinckney's physical or mental condition following the termination of her family's Section 8 rent subsidy.

85.     In the meantime, Ms. Pinckney appeared in Bronx housing court *pro se* in late February, March, April and May 2017 in case number L&T-42983-16/BX.  On May 30, 2017, the Bronx housing court entered an order staying execution of the then-outstanding warrant of eviction until June 15, 2017 for Ms. Pinckney to pay her Section 8 tenant share of rent arrears accrued through May 2017 and, upon timely payment of such arrears, further staying execution of the warrant through June 30, 2018 for Ms. Pinckney to pay her tenant share of the June 2017 rent.  Ms. Pinckney made these two payments in accordance with the court's order.

86.     In September 2017, 1211 Southern Boulevard, LLC filed another summary eviction proceeding in Bronx housing court, index number L&T-050811-17/BX, alleging that they had terminated Ms. Pinckney's lease because she had violated the terms of her tenancy by failing to maintain a Section 8 subsidy, and that her family should be evicted.  That proceeding was adjourned several times between September 2017 and May 2018 while the court again appointed a guardian ad litem for Ms. Pinckney.

87.     During this proceeding, Plaintiff was told by his mother that she believed the Bronx housing court would help her restore her HPD Section 8 voucher.  Plaintiff believed that his mother's Section 8 subsidy would be restored as part of case number L&T-050811-17/BX, and that his family would again have a secure way of paying the rent for their apartment.

88.     Court records indicate that HPD was served with a subpoena to appear before the court in case number L&T-050811-17/BX.  A stipulation executed on May 23, 2018,

21

between Ms. Pinckney's guardian ad litem and counsel for 1211 Southern Boulevard, LLC, states that "Section 8 remains under subpoena."

89.     Upon information and belief, a representative of HPD appeared in court on May 23, 2018 and informed the court that HPD would not restore Ms. Pinckney's Section 8 rent subsidy.

90.     After that, Ms. Pinckney told family members that, contrary to what she had believed, the court would not be able to restore her Section 8 voucher. After concluding that HPD had no intention of restoring her Section 8 rent subsidy, Ms. Pinckney became despondent and feared that her family would soon be put out of their home.  Her health continued to decline.

91.     On June 13, 2018, a few weeks after HPD's appearance in case number L&T-050811-17/BX, Ms. Pinckney died at age 55.

92.     Plaintiff reported his mother's death to HPD in July 2018, but remained unable to obtain any information or assistance from HPD relating to his now-deceased mother's Section 8 rent subsidy.

93.     Following Ms. Pinckney's death, 1211 Southern Boulevard, LLC continued to pursue the eviction of her surviving family members in case number L&T-050811-17/BX.

94.     In July 2018, Plaintiff contacted Bronx Legal Services to seek assistance in connection with case number L&T-050811-17/BX, and retained Bronx Legal Services as his counsel.

95.     On August 27, 2018, Plaintiff's counsel contacted HPD by electronic mail, requesting that his mother's Section 8 subsidy be reinstated, and that Plaintiff be allowed to retain the use of such Section 8 subsidy as his mother's remaining household member.

22

96.     Later on August 27, 2018, Plaintiff's counsel received a response by electronic mail from Evelyn Ruiz of HPD, stating:  "HPD will not consider reinstatement for a head of household that is now deceased. This case will remain terminated.  Thank you."

97.     On September 6, 2018, the Bronx housing court dismissed case number L&T-050811-17/BX on the grounds that Ms. Pinckney, the tenant, was deceased and 1211 Southern Boulevard, LLC had failed to substitute her estate or an administrator thereof.

98.     On or around September 19, 2018, Plaintiff received a notice from 1211 Southern Boulevard, LLC, stating that he had five days either to pay $21,818.00 to 1211 Southern Boulevard, LLC, or to give up possession of his family's apartment.

99.     On or around October 10, 2018, 1211 Southern Boulevard, LLC commenced a new summary eviction proceeding against Plaintiff, as surviving issue of Ms. Pinckney, in the Bronx housing court.  The index number of the proceeding is L&T-053329-18/BX.

100.    This third proceeding remains pending before the Bronx housing court, and has been adjourned to January 28, 2019.  In this proceeding, 1211 Southern Boulevard, LLC seeks payment of $21,818.00 and issuance of a warrant of eviction as well as recovery of attorney's fees at the rate of $350.00 per hour.

101.    HPD personnel did not provide Ms. Pinckney with an equal opportunity to participate in the Section 8 program following her stroke and her ensuing mental and physical disability.  HPD's failure to accommodate Ms. Pinckney's disability continued after she disclosed to HPD personnel that she had suffered a stroke, and that she had failed to submit a written request for a hearing by HPD's deadline because she had been hospitalized.

102.    Plaintiff's family has now lived under threat of eviction for over two

years.  His mother struggled against the steady deterioration of her health to protect her home

and regain her Section 8 rent subsidy for the benefit of her children, but had been frustrated by

Defendants in those efforts at the time of her death.

103.    Had Ms. Pinckney never suffered a stroke, or had Defendants fulfilled

their legal obligations by making reasonable accommodation for her disability, Plaintiff would

have succeeded to Ms. Pinckney's Section 8 rent subsidy as a surviving family member included

in Ms. Pinckney's household at each of her required recertifications under the Section 8 program.

Due solely to Defendants' failure to comply with federal, state and local law, Plaintiff can no

longer access the assistance that allowed his family to afford their apartment for the past ten

years.

104.    Instead, the course of events that began with Ms. Pinckney's stroke in

2016—compounded by HPD's continuing refusal to consider the disability and medical

conditions that led first to the termination of her Section 8 subsidy and later to her death—

continues to threaten her sons with a return to the City homeless shelters which they thought they

had left behind as children in 2008.

105.    Plaintiff brings the present action in the hope of averting that outcome.

## CAUSES OF ACTION

### First Cause of Action

### Violations of the Americans with Disabilities Act and the Rehabilitation Act

106.    Plaintiff re-asserts and re-alleges the allegations contained in paragraphs 1

to 105 above.

107.    From the time of her stroke in September 2016 until her death in June

2018, Laurette Pinckney was a person with a "disability" within the meaning of the ADA and the

24

Rehabilitation Act; and was a "qualified individual with a disability" within the meaning of the ADA.  During this time, Ms. Pinckney was an "individual with handicaps" within the meaning of 24 C.F.R. § 8.4(b)(2) and other applicable regulations implementing the Rehabilitation Act.

108.    Defendants City of New York and HPD are "public entities" under the ADA and, as such, must make reasonable modifications in policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability.  42 U.S.C. §§ 12131(2), 12132; 28 C.F.R. § 35.130(b)(7).

109.    The Section 8 housing voucher program, as administered by HPD under its Administrative Plan, is a "program or activity receiving Federal financial assistance" within the meaning of the Rehabilitation Act.

110.    Defendants City of New York and HPD, as public entities under the ADA, may not utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; and may not limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.  28 C.F.R. §§ 35.130(b)(1)(vii), 35.130(b)(3)(i).

111.    HPD is required to provide reasonable accommodations to qualified persons with disabilities to allow them to participate in its programs under the ADA and its own Administrative Plan.  HPD Admin. Plan, Ch. 2.3.

112.    Ms. Pinckney's disability was known or should have been known to HPD no later than the date of termination of her Section 8 rent subsidy on February 28, 2017.

113.    Ms. Pinckney was entitled to receive help with the restoration of her Section 8 rent subsidy and with the compliance with HPD's applicable requirements necessary in

25

connection therewith, as a reasonable accommodation of her disability.

114.    Such accommodation would have required HPD simply to review the documentation she submitted to them in or around February 21, 2017, and to provide Ms. Pinckney with reasonable opportunities to correct or supplement such documentation as necessary to comply with HPD's recertification requirements and avert the termination of her Section 8 subsidy.  In the alternative, HPD could have provided Ms. Pinckney with the opportunity to contest her termination at an informal hearing or conference.

115.    HPD refused to take either of these reasonable steps and failed to engage in any dialogue to determine other ways to accommodate Ms. Pinckney's disability in connection with the termination of her Section 8 rent subsidy.

116.    Defendants discriminated against Ms. Pinckney due to her disability by failing to make reasonable modifications to HPD's policies, practices, or procedures that were necessary for her to participate in and enjoy the benefits of the Section 8 program.

117.    As a result of such discrimination, Ms. Pinckney and her family remained without their Section 8 rent subsidy at the time of her death.

118.    But for Defendants' unlawful discrimination against Ms. Pinckney, Plaintiff would have succeeded to Ms. Pinckney's Section 8 rent subsidy as a surviving adult household member who had been in part of the household for at least 180 days at the time of her death, in accordance with the Administrative Plan.  Due solely to Defendants' unlawful discrimination, Plaintiff lost his opportunity to succeed to his mother's Section 8 benefits.

119.    Because Ms. Pinckney died before managing to restore her Section 8 rent subsidy, HPD now refuses to reinstate such subsidy or to allow Plaintiff to retain the use of such subsidy for the benefit of Ms. Pinckney's surviving family.

120.     Plaintiff has suffered an independent injury resulting from Defendants'

violation of the ADA and Rehabilitation Act, and resulting from his association with his mother

as a member of her household and potential successor to her Section 8 rent subsidy.

121.     As a result of this independent injury, Plaintiff has standing to seek relief

under the ADA as set forth herein.

122.     Plaintiff is a "person aggrieved by any act or failure to act by any recipient

of Federal assistance or Federal provider of such assistance under section 504 of [the

Rehabilitation] Act," within the meaning of 29 U.S.C. § 794a(a)(2).

123.     Plaintiff accordingly has standing to bring this action under 29 U.S.C.

§ 794a(a)(2).

## Second Cause of Action

## Violations of Title VIII of the Civil Rights Act of 1968

124.     Plaintiff re-asserts and re-alleges the allegations contained in paragraphs 1

to 105 above.

125.     From the time of her stroke in September 2016 until her death in June

2018, Laurette Pinckney was a person with a "handicap" within the meaning of the FHA and

implementing regulations.

126.     The FHA prohibits HPD from discriminating against any person in the

provision of services in connection with a dwelling, because of a handicap of that person, or any

person associated with that person, including by means of any "refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be

necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C.

§ 3604 (f)(3); *see also* 24 C.F.R. § 100.204(a).

27

127.     Defendants discriminated against Ms. Pinckney due to her handicap by failing to make reasonable accommodations in HPD's rules, policies, practices, or services, when such accommodations were necessary to afford Ms. Pinckney an equal opportunity to use and enjoy her home, which she and her family could not afford without the restoration of their Section 8 subsidy.

128.     As a result of such discrimination, Ms. Pinckney and her family remained without their Section 8 rent subsidy at the time of her death.

129.     But for Defendants' unlawful discrimination against Ms. Pinckney, Plaintiff would have succeeded to Ms. Pinckney's Section 8 rent subsidy as a surviving adult household member who had been in part of the household for at least 180 days at the time of her death, in accordance with the Administrative Plan.  Due solely to Defendants' unlawful discrimination, Plaintiff lost his opportunity to succeed to his mother's Section 8 benefits.

130.     Because Ms. Pinckney died before managing to restore her Section 8 rent subsidy, HPD now refuses to reinstate such subsidy or to allow Plaintiff to retain the use of such subsidy for the benefit of Ms. Pinckney's surviving family.

131.     Plaintiff has been injured by a discriminatory housing practice and is accordingly an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i).  Plaintiff thus has standing to bring this action pursuant to 42 U.S.C. § 3613(a)(1).

132.     Plaintiff is entitled to recover damages and injunctive relief pursuant to 42 U.S.C. § 3613(c)(1).

### **Third Cause of Action**

### **Violations of the New York State Human Rights Law**

133.     Plaintiff re-asserts and re-alleges the allegations contained in paragraphs 1

to 105 above.

134.    From the time of her stroke in September 2016 until her death in June 2018, Laurette Pinckney was an individual with a "disability" within the meaning of the New York State Human Rights Law.

135.    Defendant HPD is a "place of public accommodation" within the meaning of the New York State Human Rights Law and, as such, may not engage in any unlawful discriminatory practice with respect to a person with a disability, including any "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations." N.Y. Exec. Law §§ 296(2)(a), (c).

136.    Defendants discriminated against Ms. Pinckney due to her disability by failing to make reasonable modifications to HPD's policies, practices, or procedures that were necessary for her to participate in and enjoy the benefits of the Section 8 program.

137.    Such modifications would not have fundamentally altered the nature of any facility, privilege, advantage or accommodation provided by HPD.

138.    As a result of such discrimination, Ms. Pinckney and her family remained without their Section 8 rent subsidy at the time of her death.

139.    But for Defendants' unlawful discrimination against Ms. Pinckney, Plaintiff would have succeeded to Ms. Pinckney's Section 8 rent subsidy as a surviving adult household member who had been in part of the household for at least 180 days at the time of her death, in accordance with the Administrative Plan.  Due solely to Defendants' unlawful

29

discrimination, Plaintiff lost his opportunity to succeed to his mother's Section 8 benefits.

140.    Because Ms. Pinckney died before managing to restore her Section 8 rent subsidy, HPD now refuses to reinstate such subsidy or to allow Plaintiff to retain the use of such subsidy for the benefit of Ms. Pinckney's surviving family.

141.    Plaintiff has suffered injury as a result of Defendants' discrimination against his deceased mother, and has a cause of action as a person aggrieved by an unlawful discriminatory practice under N.Y. Exec. Law § 297(9).

142.    Plaintiff is entitled to recover damages in an amount to be determined at trial, and injunctive relief, pursuant to N.Y. Exec. Law § 297(9).

### Fourth Cause of Action

### Violations of the New York City Human Rights Law

143.    Plaintiff re-asserts and re-alleges the allegations contained in paragraphs 1 to 105 above.

144.    From the time of her stroke in September 2016 until her death in June 2018, Laurette Pinckney was an individual with a "disability" within the meaning of the New York City Human Rights Law.

145.    Defendant HPD is a "place or provider of public accommodation" within the meaning of the New York City Human Rights Law and, as such, may not engage in any unlawful discriminatory practice with respect to a person with a disability.  Among other things, HPD may not, because of a person's disability, "refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." N.Y.C. Admin. Code § 8-106(4)(1)(a).

146.    HPD was further required to "make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."  N.Y.C. Admin. Code § 8-106(15)(a).

147.    Defendants discriminated against Ms. Pinckney due to her disability by failing to make reasonable accommodations that would have allowed Ms. Pinckney the full and equal enjoyment, on equal terms and conditions, of the accommodations, advantages, services, facilities or privileges provided by HPD as a public housing agency as part of the Section 8 program.

148.    The accommodations necessary to allow Ms. Pinckney the full and equal enjoyment, on equal terms and conditions, of the accommodations, advantages, services, facilities or privileges provided by HPD as part of the Section 8 program would have imposed no undue hardship on HPD's operations.

149.    As a result of such discrimination, Ms. Pinckney and her family remained without their Section 8 rent subsidy at the time of her death.

150.    But for Defendants' unlawful discrimination against Ms. Pinckney, Plaintiff would have succeeded to Ms. Pinckney's Section 8 rent subsidy as a surviving adult household member who had been in part of the household for at least 180 days at the time of her death, in accordance with the Administrative Plan.  Due solely to Defendants' unlawful discrimination, Plaintiff lost his opportunity to succeed to his mother's Section 8 benefits.

151.    Because Ms. Pinckney died before managing to restore her Section 8 rent subsidy, HPD now refuses to reinstate such subsidy or to allow Plaintiff to retain the use of such subsidy for the benefit of Ms. Pinckney's surviving family.

152.    Plaintiff has suffered injury as a result of Defendants' discrimination

31

against his deceased mother, and has a cause of action as a person aggrieved by an unlawful

discriminatory practice under section 8-502(a) of the New York City Human Rights Law.  N.Y.

Admin. Code § 8-502(a).

153.    Plaintiff is entitled to recover damages in an amount to be determined at

trial, and injunctive relief, pursuant to N.Y. Admin. Code § 8-502(a).

**Fifth Cause of Action**

**Annulment of Determination by Municipal Body or Officer under CPLR Article 78**

154.    Plaintiff re-asserts and re-alleges the allegations contained in paragraphs 1

to 105 above.

155.    Before Laurette Pinckney's death in June 2018, HPD engaged in unlawful

discriminatory practices against Ms. Pinckney, in violation of the ADA, the Rehabilitation Act,

the New York State Human Rights Law and the New York City Human Rights Law.

156.    But for Defendants' unlawful discrimination against Ms. Pinckney,

Plaintiff would have succeeded to Ms. Pinckney's Section 8 rent subsidy as a surviving adult

household member who had been in part of the household for at least 180 days at the time of her

death, in accordance with the Administrative Plan.  Due solely to Defendants' unlawful

discrimination, Plaintiff lost his opportunity to succeed to his mother's Section 8 benefits.

157.    HPD's refusal, on August 27, 2018, to correct its unlawful and

discriminatory actions by reinstating Ms. Pinckney's Section 8 voucher, and allowing Plaintiff to

retain the use thereof, was arbitrary and capricious and constituted an abuse of discretion.

158.    Pursuant to section 7806 of the New York Civil Practice Law and Rules,

Plaintiff is entitled to a judgment:  (a) annulling HPD's decision of August 27, 2018 in its

entirety; (b)  directing Defendants Torres-Springer and HPD to reinstate Ms. Pinckney's Section

8 subsidy retroactive to the effective date of its termination; (c) directing Defendants Torres-Springer and HPD to allow Plaintiff to retain the use of Ms. Pinckney's Section 8 subsidy as remaining household member of Ms. Pinckney; and (d) ordering Defendants Torres-Springer and HPD to issue payment of the Section 8 subsidy portion of Ms. Pinckney's rent retroactive to the date the subsidy was terminated.

## DEMAND FOR JURY TRIAL

159.    Pursuant to rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court:

1.    Enter a judgment declaring that Defendants discriminated against Laurette Pinckney, and against Plaintiff based on his association with Laurette Pinckney, in violation of:

   a.   Title II of the Americans with Disabilities Act, as amended, and its implementing regulations

   b.   Section 504 of the Rehabilitation Act of 1973, as amended, and its implementing regulations;

   c.   Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, and its implementing regulations;

   d.   The New York State Human Rights Law, and its implementing regulations; and

   e.   The New York City Human Rights Law, and its implementing regulations;

2.    Enter a judgment annulling in its entirety the determination by Defendants Torres-

Springer and HPD dated August 27, 2018, declining to reinstate Laurette

Pinckney's Section 8 subsidy and to allow Plaintiff to retain the use of such

Section 8 subsidy as remaining household member of Ms. Pinckney; and finding

such determination to be arbitrary and capricious and an abuse of discretion; and

3.      Enter injunctive relief:

    a.   Directing Defendants to reinstate Ms. Pinckney's Section 8 subsidy

       retroactive to the effective date of its termination;

    b.   Directing Defendants to allow Plaintiff to retain the use of Ms. Pinckney's

       Section 8 subsidy as remaining household member of Ms. Pinckney;

    c.   Ordering Defendants to issue payment of the Section 8 portion of Ms.

       Pinckney's rent retroactive to the date the subsidy was terminated;

    d.   Ordering Defendants to adopt policies, practices, and procedures for HPD's

       Section 8 program, designed to ensure that HPD provides reasonable

       accommodations to individuals with disabilities in accordance with applicable

       law and regulation, in connection with any recertification, termination of

       assistance or appeal of such termination; and

    e.   Ordering Defendants to provide trainings to personnel in HPD's Section 8

       program regarding HPD's responsibility to provide reasonable

       accommodations to individuals with disabilities in accordance with applicable

       law and regulation, in connection with any recertification, termination of

       assistance or appeal of such termination;

4.      Enter a judgment awarding Plaintiff actual, compensatory, and punitive damages

    for injuries and expenses incurred as a result of Defendants' foregoing violations

34

of law;

5.    Award Plaintiff reasonable attorney's fees, costs and disbursements pursuant to

29 U.S.C. § 794a(b); 42 U.S.C.  § 3613(c)(2); and  N.Y.C. Admin. Code

§ 8-502(g); and

6.    Grant such other and further relief as the Court deems just and proper.

Dated: December 26, 2018
        Bronx, New York                        Respectfully submitted,

                                                /s/ Jean Fischman
                                                BRONX LEGAL SERVICES
                                                Chiansan Ma, Esq.
                                                Jean Fischman, Esq.
                                                Carolyn Norton, Esq.
                                                369 East 148th Street, Second Floor
                                                Bronx, New York 10455
                                                (718) 928-3713
                                                *Counsel to Plaintiff*